| **Tica v Metz** |
| :---: |
| 2024 NY Slip Op 31497(U) |
| April 26, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 524414/2018 |
| Judge: Genine D. Edwards |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

SANDRA TICA, as the Administrator of the Estate of
MARIE TREBILCOCK, deceased.

*Plaintiff,*

– against –

MICHAEL METZ, D.O., SAMUEL AYALA, M.D.,
and NEW YORK PRESBYTERIAN BROOKLYN
METHODIST HOSPITAL,

*Defendants.*

---

Index No.: 524414/2018

**DECISION AND ORDER**

Motion Seq. 2

---

The following e-filed papers read herein:                                     NYSCEF Nos.:

Notices of Motion, Affirmations, and Exhibits.....................................49-73

In this action to recover damages for medical malpractice, lack of informed consent, and negligent hiring, defendants Michael Metz, D.O. ("Dr. Metz"), Samuel Ayala, M.D. ("Dr. Ayala"), New York Presbyterian Brooklyn Methodist Hospital ("New York Presbyterian") moved for summary judgment seeking to dismiss the complaint pursuant to CPLR §3212.[1]

## FACTS

Marie Trebilcock ("Decedent"), a 68-year-old woman at the time of the allegations, had a medical history of a prior left frontal stroke, stenosis of her right internal carotid artery, coronary artery disease with one stent, and transient ischemic attack ("TIA")/cerebrovascular accident ("CVA" or stroke). Decedent was in a car accident in 1999, as a result of which she suffered a traumatic brain injury and underwent surgery to have a rod put in her leg and experienced vision issues. Decedent also smoked cigarettes for over 40 years.

---

[1] Plaintiff's opposition was filed untimely and thus not considered in deciding this motion.

1

On October 30, 2016, the decedent was at a family wedding in Brooklyn, where she was drinking and dancing and began to feel dizzy and weak. An ambulance was called, and decedent arrived at New York Presbyterian's emergency department at 10:02 pm. The ambulance call sheet noted the family indicated decedent was unresponsive but was alert by the time they arrived. Her Stroke Scale was negative, and the ambulance team noted her neurovascularly intact across all extremities, her vitals were within normal limits apart from her elevated blood pressure at 142/84. Decedent was then triaged by Nurse Sybico. Her blood pressure was 153/92 and she was afebrile. Decedent described a 9/10 head pain, with a duration of less than one day and her triage diagnosis was dizziness and headache.

Following triage, decedent was assigned to Drs. Ayala and Metz, with Dr. Metz taking a history and performing a physical of decedent. Dr. Metz noted decedent's past medical history of coronary artery disease with one stent and TIA/CVA and that decedent was coming in for an episode of dizziness and right sided headache that occurred while at a wedding after drinking three drinks and dancing. Decedent admitted to drinking three drinks and denied loss of consciousness, chest pain, fever, chills, sweats, nausea/vomiting/diarrhea/chills, abdominal pains, urinary complaints, numbness, tingling, weakness, visual problems, neurologic issues, or musculoskeletal issues. Decedent did complain of lightheadedness. Dr. Metz then performed a neurological examination and a CT scan of decedent's head. Dr. Metz documented a differential diagnosis which included dizziness, dehydration, urinary tract infection, and pneumonia. Other vitals were within normal limits and the CT scan revealed no intracranial hemorrhages, extra axial fluid collections or evidence of an intra-axial mass lesion. At 1:09 am, decedent's blood pressure level remained at 153/92.

Decedent was subsequently given fluids to address hydration and Reglan for her headache,

2

[* 2]

along with Benadryl and Toradol. At 2:18 am on October 31, 2016, decedent's blood pressure increased to 193/131, and thereafter 219/136 at 5:55 am. Dr. Metz was notified of the increase in blood pressure, and he ordered 10 mg of Amlodipine, which was administered at 6:20 am. At 7:53 am, decedent's blood pressure was recorded at 201/105 and she was subsequently discharged home at 7:58 am with instructions to follow up with her primary care provider within 3-5 days, or to return to the emergency department if her symptoms worsened. Decedent was picked up by her son and granddaughter and they drove out to Long Island to drop granddaughter off at school and then home to Orange County.

When decedent arrived in Orange County, she had difficulty standing while trying to get out of the car. Decedent was later brought to Orange Regional Medical Center ("ORMC") around 2:39 pm, approximately 6.5 hours after leaving New York Presbyterian. When she presented to the ORMC, decedent's blood pressure was 167/78 and the plan at ORMC was to admit the patient. Decedent did not receive tissue plasminogen activator because it was believed her symptoms had begun two days prior. A CT scan of the brain was performed at 4:32 pm, the history provided for the study was "bilateral" leg weakness. The scan indicated that there was no evidence of acute infarct, mass lesion or hemorrhage, and if clinical symptoms persisted a further evaluation with brain MRI was recommended. At 3:02 pm, decedent's blood pressure was 210/91, and at 4:22 pm it was 202/92. At 5:01 her blood pressure was 154/117. Within the next hour, at 6:02 pm, and despite ongoing medicinal pressure control, the blood pressure rose again to 212/91, followed by another drop to 162/72 at 6:46 pm. On November 1, 2016, a second CT scan of the brain was performed at or about 10:20 am, the indication being worsening speech, left sided weakness and possible CVA. In comparison to the first CT scan performed the day before, this scan now demonstrated a "new" area of hypodensity within the right parietal lobe suspicious for "evolving

3

acute infarction." Later that day, at 11:27 a.m. a bilateral Doppler of the carotids was performed given suspicion of a CVA. The findings were significant for a greater than 50% luminol stenosis within the proximal right internal carotid artery. Decedent was brought to ICU for ongoing blood pressure control. On November 2, 2016, a CT angiogram was performed, the impression being occlusion of the right internal carotid artery and large perfusion defect in the right MCA distribution. Decedent was discharged on November 8, 2016 to Somers Manor Rehabilitation. Decedent was subsequently sent to Northern Westchester hospital and then to Salem Hills Nursing and Rehabilitation Center until it became a COVID facility. She was transferred to Waterview Hills Rehabilitation and Nursing Home where she was diagnosed with small cell lung cancer. Decedent's family chose to pursue palliative care and decedent resided at Rosary Hill Home until she passed away on June 5, 2022.

<u>LAW</u>

The elements of a medical malpractice claim are a deviation or departure from accepted practice and evidence that such a departure was approximate cause of injury or damage. *McHale v. Sweet*, 217 A.D.3d 666, 190 N.Y.S.3d 438 (2d Dept. 2023). A defendant's negligence is the proximate cause when it is a substantial factor in the events that produce the injury. *Templeton v. Papathomasz*, 208 A.D.3d 1268, 175 N.Y.S.3d 544 (2d Dept. 2022).

Summary judgment is warranted where the movants can demonstrate the absence of any relevant material issue of fact, and therefore are entitled to judgment as a matter of law. *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320,324 (1986); see *Winegrad v. New York Univ. Med. Ctr.*, 64 N.Y.2d 851 (1985). "When moving for summary judgment, a defendant...must establish the absence of any departure from good and accepted medical practice or that...plaintiff was not injured thereby." *Barnaman v. Bishop Hucles Episcopal Nursing Home*, 213 A.D.3d 896, 184 N.Y.S.3d 800 (2d

4

[* 4]

Dept. 2023). To sustain the burden, a defendant "must address and rebut any specific allegations of malpractice set forth in plaintiff's bill of particulars." *D.S. v. Poliseno*, 189 A.D.3d 1102, 133 N.Y.S.3d 831 (2d Dept. 2020).

## ANALYSIS

Defendants argued that they are entitled to summary judgment because decedent was appropriately treated and there were no departures from the standard of care as to the care and treatment rendered. Defendants also contended that none of decedent's alleged injuries were proximately caused by anything they did or allegedly failed to do. In support, defendants submitted the affirmations of Drs. Silberman and Levine and deposition testimony, inter alia.

Drs. Silberman and Levine collectively opined that based upon their review of the medical records decedent received care and treatment in accordance with the standards of good and accepted medical practice. However, both physicians acknowledged that Dr. Metz never included stroke in his differential diagnosis, but speculated he must have considered it given his order for a CT scan of decedent's head. Decedent's blood pressure levels continued to rise from her initial arrival at New York Presbyterian's emergency department at 10:02 pm until at least 6:20 am, when she was given the anti-hypertensive medication Amlodipine, a period of at least eight hours. Decedent's blood pressure levels decreased from 219/136 to 201/105 over a period of less than two hours, and she was discharged from the hospital five minutes after her first reading of decreased blood pressure. This blood pressure reading was higher than her blood pressure reading when she was admitted. Dr. Ayala testified that in his experience with Amlodipine, its peak onset is five to six hours even though one could start seeing effects within an hour or two. Dr. Ayala also indicated that a profound lowering of blood pressure too quickly could be detrimental.

Based on Dr. Ayala's testimony, absent admitting decedent for further evaluation,

5

[* 5]

defendants could not be aware of decedent's response to the medication at its peak onset and would not be aware of whether decedent's blood pressure would continue to drop to detrimental levels.

Additionally, the experts extrapolate findings from subsequent treating medical records from ORMC ignoring the fact that defendants were not, and could not, be aware of what the patient's blood pressure readings were when she presented to the ORMC. Thus, among other issues, triable issues of fact exist regarding the failure to call a stroke code and urgent neurological consultation, as well as the failure to admit decedent for further evaluation and treatment based on her blood pressure levels.

Accordingly, it is

ORDERED that defendants' motion for summary judgment is in all respects denied, and it is further

ORDERED that plaintiff's counsel is directed to electronically serve a copy of this Decision/Order with notice of entry on defendants' respective counsel and to electronically file an affidavit of service with the Kings County Clerk, and it is further

ORDERED that the parties shall appear for an Alternative Dispute Resolution conference on May 28, 2024, at 2:30PM.

The foregoing constitutes the Decision and Order of this Court.

APR 26 2024

ENTER,

Genine D. Edwards
J.S.C

6

[* 6]